liPER CURIAM.
This election contest case stems from the runoff election for sheriff of Red River Parish held on November 20, 1999. In that election, the candidates were David G. Adkins and Lester Shields “Buddy” Huck-abay, III. Adkins received 2,246 votes; Huckabay received 2,249 votes. Of those totals, Adkins received 171 absentee votes, while Huckabay received 308 absentee votes. Adkins subsequently brought a timely election contest suit seeking either to be declared the winner, or to have a new election. At the conclusion of a trial that included numerous witnesses and exhibits, the trial court voided the runoff election and ordered a new election to be held on February 5, 2000. In oral reasons for judgment, the trial court concluded that some 38 votes should not have been counted in the election. Huckabay, joined by the commissioner of elections and the secretary of state, moved for an appeal.
For the reasons set forth below, we reverse the trial court’s judgment voiding the results of the runoff election, and we render judgment declaring Huckabay the winner of the runoff election for sheriff of Red River Parish.
DISCUSSION
Article 11, § 1 of the Louisiana Constitution requires the legislature to adopt an election code that provides for permanent registration of voters and for the conduct of all elections. Article 11, § 2 requires voting to be by secret ballot, and requires the legislature to provide a method for absentee voting. The placement of the requirement for absentee voting in the Constitution itself, alongside other basic requirements concerning voting, shows the fundamental importance of absentee voting to our electoral process and to the citizen’s right of suffrage. Accordingly, absentee voting is not a special privilege in derogation of general voting law, and ^statutes enacted pursuant to the constitutional mandate for absentee voting should not be strictly construed so as to void absentee ballots in every instance where there is some failure, especially on the part of an election official, to follow statutory provisions on absentee voting to the letter.
A sizable majority of jurisdictions in the United States construe absentee voting laws liberally, as opposed to strictly, in order to accomplish the purpose for which they were adopted: to protect and further a citizen’s right to vote. Roe v. Mobile County Appointment Board, 676 So.2d 1206 (Ala.1995). Reasons for utilizing a more liberal construction are well stated in the Florida Supreme Court’s opinion in Boardman v. Esteva, 323 So.2d 259 (Fla.1975):
We first take note that the real parties in interest here, not in the legal sense but in realistic terms, are the voters. They are possessed of the ultimate interest and it is they whom we must give primary consideration. The contestants have direct interests certainly, but the office they seek is one of high public service and of utmost importance to the people, thus subordinating their interest to that of the people. Ours is a government of, by and for the people. Our federal and state constitutions guarantee the right of the people to take an active part in the process of that government, which for most of our citizens means participation via the election process. The right to vote is the right to participate; it is also the right to speak, but more importantly the right to be heard. We must tread carefully on that right or we risk the unnecessary and unjustified muting of the public voice. By refusing to recognize an otherwise valid exercise of the right of a citizen to vote for the sake of sacred, unyielding adherence to statutory scripture, we would in effect nullify that right.
Other similar, practical reasons for adopting a rule of substantial compliance, rather than strict compliance, are found in the Colorado Supreme Court’s opinion in *903 Erickson v. Blair, 670 P.2d 749 (Colo.1983):
We believe the time has come to interpret absentee voting legislation in light of the realities of modern life and the fundamental character of the right of suffrage. We live in a society which, to a great extent, depends upon mobility as an indispensable condition of progress. Many persons for legitimate reasons cannot be physically present at a polling place to cast their ballots on the day of the election. These electors, no less than in-person voters, should be able to present their views on issues of public importance without being encumbered by an unyielding standard of statutory exactitude. ^Moreover, the right to vote is a fundamental right of the first order. Absentee voting legislation should not be construed in a manner that unduly interferes with the exercise of this right by those qualified to vote. Nor should the exercise of the voting right be conditioned upon compliance with the degree of precision that in many cases may be a source of more confusion than enlightenment to interested voters. A rule of strict compliance, especially in the absence of any showing of fraud, undue influence, or intentional wrongdoing, results in the needless disenfranchisement of absentee voters for unintended and insubstantial irregularities without any demonstrable social benefit.
Although we are unaware of any Louisiana case directly stating that absentee voting statutes should be accorded liberal construction and honored in substantial compliance, the wisdom of such a standard is implicit in Meyer v. Keller, 376 So.2d 636 (La.App. 3rd Cir.1979). In that case, the trial court disallowed six absentee ballots cast for the winner. However, the appellate court reversed. The trial court had disallowed one ballot because the voter was not signed in on the poll list by the Commissioners at the poll as required by law. The Meyer court cited the decision of Champagne v. Ackal, 256 So.2d 483 (La.App. 3rd Cir.1972), for the general rule that, where the electors have had a fair and free opportunity to express their will at the polls, and have done so, the result of their choice will not be set aside because of the failure of a ministerial officer to perform some duty imposed upon him by law. Applying those principles, the Meyer court concluded that the failure of the commissioners to enter the voter’s name in the poll list was not such an irregularity as to void the vote. The trial court also disallowed two ballots because the voters’ names on the absentee ballot flaps did not exactly match names on the precinct register. Finding no statute or jurisprudence requiring an absentee ballot to be invalidated for failure of the voter to sign the absentee ballot exactly as Ms name is listed in the precinct register, the appellate court concluded that the two ballots should have been counted.
Of particular significance for our purposes in this case was a ballot the trial judge in Meyer disallowed because it was not signed by the clerk of court. Again |4citing the principles expressed in Champagne, the Meyer court concluded that no policy would be advanced by disallowing the voter’s vote for the failure, of the clerk to sign the affidavit. Thus, the Meyer court concluded the trial court erred in disallowing that vote. See also Brunet v. Evangeline Parish Board of Supervisors of Elections, 379 So.2d 271 (La.App. 3d Cir.1979).
In Boardman, supra, the court held that the primary consideration in an election contest is whether the will of the people has been effected. In determining the effect of irregularities on the validity of absentee ballots cast, the court set forth the following factors for consideration:
(A) The presence or absence of fraud, gross negligence, or intentional wrongdoing;
(B) Whether there has been substantial compliance with the essential re *904 quirements of the absentee voting law; and
(C) Whether the irregularities complained of adversely affect the sanctity of the ballot and the integrity of the election.
We subscribe to these factors for use in determining the effect of irregularities on the validity of absentee ballots in Louisiana elections.

Preliminary Matters

Before turning to the facts of the instant case, we begin by observing that the trial court concluded there was no evidence of fraud in this case; we agree. Mistakes were made, but those mistakes were good-faith errors, not intentional wrongdoing. Furthermore, we cannot characterize them as “gross negligence,” a term that might best be characterized in the present setting as indifference to a legal duty or the absence of even slight diligence. Thus, we will focus our attention on whether there has been substantial compliance with the absentee voting law and whether irregularities complained of adversely affected the sanctity of the ballot and the integrity of the election.
We also make two other findings at the outset. First, we conclude that the trial court made a factual determination within its great discretion when it | ^concluded that an election protest of Donald Browne on behalf of Adkins was sufficient to encompass not only all mail-in ballots eventually rejected by the Board of Election Supervisors, but also the mail-in ballot of Josie Mae Fowler and the “walk-in” absentee ballots cast in the registrar’s office. Second, we find no merit to the argument raised by Adkins in his motion to dismiss this appeal on the basis that a bond for costs incurred in connection with this appeal was insufficient. Not only was the sufficiency of costs a matter that should have been challenged in the trial court, La.C.C.P. art.2088(10), but any error in assessment of the costs would not be attributable to appellant and could not defeat the validity of the appeal.

The 32 ‘Walk-in” Absentee Ballots

The trial court rejected 32 absentee ballots voted in person in the registrar’s office because the ballots were not dated, witnessed or notarized on the ballot flap. However, the parties stipulated that all the ballots were cast by registered voters who appeared at the registrar of voters’ office during the in-person absentee voting period, and that these voters signed the precinct register and signed their ballot envelope flap. As previously noted, the court in Meyer, supra, refused to invalidate an absentee ballot which the Clerk of Court had failed to sign. Similarly, we conclude that the registrar’s failure to sign the ballot envelope flap of an in-person absentee ballot cast by a qualified voter in the registrar’s office does not invalidate the ballot. Such a voter might easily assume that the registrar of voters would sign the bottom of the flap, or at least call the voter’s attention to any omissions on the flap. By coming to the registrar’s office and taking all other steps necessary to comply with in-person absentee voting procedures, such an absentee voter has substantially compiled with the essential requirements of the absentee voting law, and the absence of the registrar’s signature or a date should not invalidate a ballot otherwise executed and signed by a qualified voter. | ^Furthermore, considering the fact that the voter comes to the registrar’s office and signs a precinct register, we find that the irregularity complained of is not one that would adversely affect either the sanctity of the ballot or the integrity of the election. Any questions concerning the voter’s identity or qualifications in such circumstances easily can be answered in many instances in advance of election day, and, in any event, challenges along these lines can test such votes in court if necessary.
*905 For the preceding reasons, we conclude that the trial court erred in rejecting the 32 ballots at issue.

The Vote of Christopher McDonald

The trial court invalidated a ballot cast by Christopher McDonald on the grounds that he was a convicted felon under sentence of imprisonment, and thus disqualified from voting under La.R.S. 18:102. McDonald voted on November 12, 1999, and was convicted and sentenced on November 15, 1999. The general election was November 20,1999.
While it is true that under the provisions of R.S. 18:102 a person shall not be permitted to register or vote who is under an order of imprisonment for conviction of a felony, those provisions must be read as laws in pari materia with La.R.S. 18:171 and 18:176. These latter statutes require a registrar of voters to be sent certain reports concerning individuals convicted of felonies for which there is an order of imprisonment, and requires the registrar, in turn, to send notice to each person listed on such reports and to any person the registrar has reason to believe has been convicted of a felony and is under order of imprisonment. However, the required notice informs the person that he must appear in person at the office of the registrar of voters, within 21 days after the date on which the notice was mailed, to show cause why his registration should not he suspended. Thus, the law does not allow suspension until the 21-day period has passed; the law is not one |7which immediately suspends the right to vote subject to reinstatement by showing cause within a 21-day period. See La.Atty.Gen.Op. No. 90-10 (3/26/90); No. 99-275 (10/20/99).
In the instant case, McDonald was neither convicted nor under order of imprisonment when he voted. Furthermore, the 21-day period would not have expired (if it ever began to run) until after the election which has been contested. Thus, under the law, Christopher McDonald’s voting privileges could not have been suspended either at the time he voted absentee or at his time the ballot was counted. Accordingly, the trial court erred in disallowing his vote.

Other Disallowed Absentee Ballots

Numerous absentee ballots were challenged in this case. Some of those were challenged on election day by Donald Browne on behalf of Adkins. Forty-three ballots were rejected by the board of election supervisors and are not a subject of this appeal. Of the remaining challenged absentee ballots that are subjects of this appeal, three categories may be discerned: (1) the votes of those individuals, excluding Josie Mae Fowler, listed in paragraph 5 of plaintiffs original petition; (2) the votes of those voters listed in paragraph 6 of plaintiffs original petition; and (3) the vote of Josie Mae Fowler.
The District Court disallowed the absentee ballots of three voters listed in paragraph 5 of plaintiffs petition who allegedly were permitted to vote twice. For the reasons expressed, we find that each of these was actually a mislabeled ballot. As there is no showing that any of these voters was allowed to vote twice, we conclude the ballots should not have been disallowed.
The first challenged ballot is that of Willie Lee Brooks.[1] The record shows that Mr. Brooks, who is illiterate, voted on November 8. The absentee slip bears | ahis name at the top; his “x” was witnessed by his daughter, Gloria Black, and by Mary Jones. There was, however, another absentee ballot bearing Mr. Brooks’s name. The second ballot is marked with an “x” and is witnessed by the registrar, Ms. Kile, and by Johnny Taylor.
*906 Johnny Taylor testified that he was at the registrar’s office on November 8 when someone he knew, Viola Horton (he called her “Aunt Chicken”), came in to vote absentee; he witnessed her vote. Ms. Horton testified that she voted in the election, saying she was helped into the courthouse by “some boys.” She did not recall actually punching the form, saying she only made an “x” on it.
The District Court noted that strict procedures with respect to illiterate voting were not followed, and that Ms. Horton failed to punch the ballot. It is not clear whether the court voided Willie Lee Brooks’s ballot, or Ms. Horton’s (which was labeled “Willie Lee Brooks”). However, Ms. Horton and Mr. Taylor established that the registrar must have inadvertently written “Willie Lee Brooks” on Ms. Horton’s ballot. In light of the testimony, the registrar’s error is purely ministerial and not sufficient to void either ballot. See Meyer v. Keller, supra. Moreover, there was no showing that she received anything more than the “assistance” contemplated by La.R.S. 18:1310 B(2). The District Court’s disallowance of this vote is reversed.
The second challenged ballot is that of Cleveland Ware.[2] Mr. Donald Howard testified that he voted absentee on November 9. His ballot was witnessed by Ms. Kile, and Mr. Howard identified his signature at trial. However, another absentee ballot bore the name “Howard Donald” (the names inverted). Another voter, Cleveland Ware, who does not “read well,” testified that he also voted absentee on November 9, and that his “x” was witnessed by Ms. Millie Johnson [fland Ms. Sheila Clark. Ms. Clark verified that she witnessed Mr. Ware’s ballot, knew that he always signed with an “x,” and recognized his mark. There was no absentee ballot in the record for Cleveland Ware.
This evidence makes it abundantly clear that the registrar inadvertently placed an inverted form of Mr. Howard’s name on Mr. Ware’s absentee ballot; because Mr. Ware is unable to read, he could not detect the error. Given the testimony and the documentary evidence, this was a technical error and not grounds for disallowing Mr. Ware’s vote. Meyer v. Keller, supra.
The third challenged ballot is that of Ardis Vincent Almond.[3] Ardis Almond testified that he voted absentee on November 13; he signed the ballot, but his signature is nearly illegible. He identified his signature on the precinct register, but an incorrect registration number and ward/precinct are listed next to his name. Meanwhile, Mr. Winfred T. Almond also voted absentee. His registration number appears both on his own ballot flap and on the one identified as belonging to Ardis Vincent Almond. He testified, however, that he voted only once.
The District Court disallowed Ardis Almond’s ballot because the signature was illegible and the precinct was wrong. However, the testimony and documentary evidence clearly show that the registrar simply recorded the wrong information on Ardis’s ballot slip. To hold otherwise was clearly wrong.
There are four voters listed in paragraph 6 of the plaintiffs original petition whose votes are at issue on this appeal: Martin Green, Jocile Keith Kellogg, Elvie Robinson, and Mrs. Claude Pate. Although the circumstances of each of these voters differ somewhat, the common threads uniting this group are that all requested mail-in absentee ballots either for the primary election or the general election, that all four received hand delivered absentee ballots from the registrar of linvoters, and *907 that all four returned those ballots to the registrar’s office via individuals, rather than by mail. Before discussing each individual case, we will first review pertinent provisions for mail-in absentee voting.
The pertinent provisions of R.S. 18:1307 state:
A. A person qualified to vote absentee by mail under this Chapter may make application therefor to the registrar by letter; over his signature; setting forth:
(1) The election or elections for which he requests an absentee ballot.
(2) The reason for his request to vote absentee and attaching any documents in support thereof that are required by law.
(3) The address to which the absentee ballot or ballots, shall be sent.
(4) The ward and precinct in which the person is qualified to vote, if known.
(5) If the person requests that a ballot for a general election be sent in addition to a ballot for the primary, he shall declare in writing to the registrar that he will be eligible to vote absentee by mail in the general election.
B. Except as provided in Subsection C of this Section, an application must be received by the registrar not earlier than sixty days or later than ninety-six hours before the close of the polls for the election for which it is requested, and the date received shall be noted thereon.
* *
D. A person entitled to vote absentee by mail may request in his application for an absentee ballot for a primary election that an absentee ballot for the succeeding general election be sent to him when such ballots become available for distribution. However, in such case, the applicant shall declare in writing to the registrar that he will be eligible to vote absentee by mail in the general election.
E. The registrar shall not send an absentee ballot to an applicant whose application for an absentee ballot does not meet the requirements of Subsection A of this Section.
The pertinent provisions of R.S. 18:1310 state:
A. When a voter receives the absentee voting materials by mail or in person, he first shall fill in all blanks on the certificate on the ballot envelope flap. The voter then shall mark the ballot according to the printed instructions on its face. Then the voter shall place the ballot in the envelope, seal the envelope, and sign the certificate on the ballot envelope flap.
The above quoted provisions accomplish several goals. First, the provisions |ni 18:1307 A are designed to insure that the voter gives proper information to the registrar to show that the voter is qualified to vote absentee by mail, and that the voter gives information concerning which election(s) his request covers. The registrar must receive an application not later than 96 hours before the close of the polls, La.R.S. 18:1307 B, and this provision apparently is designed to insure that the registrar has time to mail a ballot to an applicant, and that the applicant then has time to complete the ballot and return it to the registrar. The requirements of La. R.S. 18:1307 C and D are designed both to eliminate the necessity of a voter making separate requests for a primary and a general election when the voter knows he will need to vote absentee for both, and to insure that the voter has declared his eligibility to vote in the primary and/or general election so that the registrar will only send an absentee ballot for each election in which the applicant has declared eligibility to vote absentee by mail.
*908 The provisions of La.R.S. 18:1310 A are designed to insure that a voter gives all pertinent information on the ballot envelope flap to identify the voter, and that the voter properly marks his ballot, seals the ballot envelope, and signs the certificate. These provisions insure the secrecy of the ballot, and attempt to assure that the voter has made true, correct statements regarding his ballot. We now turn to the individual cases at issue. We begin with the ballot of Jocile Keith Kellogg.
Ms. Kellogg requested a ballot for the general election, but for some unknown reason, she did not receive a ballot prior to November 18. Given the short period of time left before election day, the registrar of voters, once notified of the problem, personally delivered a ballot to Ms. Kellogg which she executed in the presence of two witnesses and returned to the registrar’s office. We are not dealing in this instance with a voter who did not request a ballot for the general election, nor are we dealing with a voter whose ballot was insufficient on its face in some respect. Instead, the only “insufficiency” we need address is the fact that |12the ballot was neither mailed by the registrar to Ms. Kellogg, nor returned by Ms. Kellogg by mail to the registrar’s office. We do not view this as sufficient to void Ms. Kellogg’s ballot. We consider Ms. Kellogg’s actions requesting a ballot for the general election, properly executing the ballot materials provided by the registrar, and returning the ballot to the registrar’s office prior to election day to be substantial compliance with the essential requirements of the absentee voting law. At the same time, we do not consider the registrar’s action, under the circumstances, to adversely affect either the sanctity of the ballot or the integrity of the election. The registrar was simply trying to rectify a mistake, attributable to someone other than Ms. Kellogg, so that Ms. Kellogg would be allowed to exercise her constitutional right to vote. At the time the registrar learned that Ms. Kellogg had not received a ballot, the registrar’s choices were either to take Ms. Kellogg a ballot or not allow Ms. Kellogg to vote absentee. The latter choice might well have resulted in forfeiting Ms. Kellogg’s right to vote in the election. Again, we note no fraud and we also observe that there is nothing inherently suspect in the method of transmittal of the ballot to and from the registrar’s office. Accordingly, we conclude the trial court erred in disallowing the vote of Ms. Kellogg.
The next ballot at issue is that of Martin Green. Like Ms. Kellogg, Mr. Green had requested a ballot for the November 20 election, but for reasons unknown did not receive his ballot prior to November 18. As was the case with Ms. Kellogg, the registrar, after notification, hand delivered a ballot to Green which he properly executed and returned to the registrar’s office. For the same reasons expressed with respect to Ms. Kellogg, we conclude that the trial court erred in disallowing the mail-in absentee vote of Martin Green.
The ballot of Elvie Robinson presents a slightly different situation. Ms. Robinson had only requested a ballot for the primary election; however, the ^registrar of voters also mailed a general election ballot to Ms. Robinson which contained the wrong police jury district; she returned this ballot and then received a second ballot with the correct police jury district. This second ballot, like the ballots of Green and Kellogg, was hand delivered by the registrar of voters on November 18, and Ms. Robinson properly executed the absentee vote documents, returning them to the registrar’s office. As in the cases of Kellogg and Green, we have no serious problem with the fact that the ballot was hand delivered to the voter by the registrar and returned by an individual to the registrar’s office. Although Ms. Robinson did not request a mail-in ballot for the general election, to disallow her ballot under the circumstances would be to allow the registrar’s apparent error in sending a general election ballot to de *909 prive the voter of her right to vote in the election. There is no reason to think that Ms. Robinson would not have requested a ballot for the general election if the registrar had not already sent her one. In fact, Robinson’s return of the incorrect ballot showed that she desired to vote in the general election, and there can be very little doubt that Ms. Robinson, who was a handicapped voter, would of necessity have voted absentee in the general election.
Furthermore, Ms. Robinson’s return of the improper ballots may be viewed a request for an absentee ballot for the general election, and any untimeliness of that request is minimized by the fact that the whole situation was the fault of the registrar and not of Ms. Robinson.
Under these circumstances, we conclude there was substantial compliance with the essential requirements of the absentee voting law, and that the irregularity complained of did not adversely affect either the sanctity of the ballot or the integrity of the election. There is no suggestion whatsoever of fraud, nor is there any question that Robinson was a qualified voter who properly completed the mail-in absentee ballot, who voted for the candidate of her choice, and who |ureturned that ballot to the registrar’s office within the time limits set for return of such ballots by law. For these reasons, we conclude the trial court erred in disallowing Ms. Robinson’s vote.
The last voter to whom the registrar hand delivered a ballot was Mrs. Claude Pate. Like Robinson, Mrs. Pate had made a request for the primary election, but not for the general election. However, the registrar mailed no ballot, correct or otherwise, to Ms. Pate for the general election. Instead a relative of Mrs. Pate telephoned the registrar requesting a general election ballot for Mrs. Pate. The registrar then delivered a ballot which Mrs. Pate voted in the presence of the registrar, and the registrar returned the ballot to her office on November 19,1999.
It is not necessary for this Court to address the validity either of Mrs. Pate’s ballot or the ballot of Josie Mae Fowler.[4] The reason lies in the three vote margin by which Huckabay defeated Adkins. Even if the votes of Pate and Fowler were subtracted from Huckabay’s winning margin, Huckabay still would prevail by a single vote. Under the provisions of La. R.S. 18:1432 Á, a trial judge must find the presence of certain enumerated factors would have been sufficient to change the result had they not occurred, before a judge may render a final judgment declaring an election void and order a new primary or general election. The enumerated factors include the impossibility of determining the result of the election, the denying of the right to vote to qualified voters in sufficient numbers to change the result of the election, the allowing of votes by unqualified voters in sufficient numbers to change the outcome of the election, or a combination of hsdenying or allowing such votes sufficient to change the result. Thus, even if we assume, arguendo, that the votes of Fowler and Pate were properly disallowed, they would not be sufficient in number to change the result of the election.

Answer to Appeal

By answer to appeal, Adkins urges the District Court erred in refusing to admit *910 the testimony of three witnesses, and one voter registration card, to establish that John McDonald Sr. voted twice. In brief, however, he presents no argument as to one of the witnesses, Celestine Frazier, so we consider that portion of the answer abandoned. URCA Rule 2-12.4; Frentress v. Howard, 31,609 (La.App. 2 Cir. 2/24/99), 728 So.2d 1019.
Adkins alleged in Paragraph 6 of his petition and argued in his case in chief, based on the stipulated voting records, that John H. McDonald Sr. voted twice in the election, once by absentee ballot and once in person on November 20. Hucka-bay countered the various allegations of impropriety, including multiple voting, by calling live witnesses to testify that they in fact did vote; however, Huckabay did not call John H. McDonald Sr. or John McDonald Jr. Instead, he relied on argument that the documentary evidence, properly assessed, would show that both the Mc-Donalds voted. At some point thereafter, Adkins attempted to present additional testimony and documents as rebuttal to the McDonald issue only. Huckabay objected on grounds that this was not proper rebuttal evidence under the circumstances. The District Court sustained the objection.
The District Court has great discretion in controlling the presentation of evidence, including the power to admit or refuse to admit rebuttal evidence. White v. McCoy, 552 So.2d 649 (La.App. 2 Cir. 1989). Rebuttal evidence is that which is “offered to explain, repel, counteract, or disprove facts given in evidence by the adverse party.” State v. Castleberry, 98-1388 (La.4/13/99), 1999 WL 213069, — So.2d-. The determination of whether evidence is rebuttal evidence and thus admissible, is | ^referred to the sound discretion of the District Court. State v. Green, 390 So.2d 1253 (La.1980). Based on our review of this difficult record, we detect no abuse of discretion in the trial court’s decision not to allow the proffered evidence as proper rebuttal.
CONCLUSION
Before closing, we wish to state that like the District Court we do not condone lax adherence to election laws. The conduct of certain election officials shown at the trial of this matter may answer such a description. However, it is more important that the matter was tested in the courtroom, no fraud was found, and the irregularities noted did not result in denying the vote to any qualified, or allowing the vote to any unqualified, voters. For the reasons expressed, the irregularities shown do not make it impossible to determine the result of the election.
Accordingly, we reverse the District Court’s judgment voiding the November 20 general election, and hereby reinstate the result of the election in which voters elected Lester Shields “Buddy” Huckabay III sheriff of Red River Parish. Costs are assessed to the appellee.
REVERSED AND RENDERED.

. This is Huckabay’s Assignment No. 2, Secretary of State’s Assignment No. 2(b), and the Commissioner’s assignment No. 4.

. This is Huckabay's Assignment No. 3, Secretary of State’s Assignment No. 2(c), and Commissioner’s Assignment No. 7.

. This is Huckabay’s Assignment No. 4, and Secretary of State’s Assignment No. 2(a). It is not specifically raised by the Commissioner, although the facts are summarized at page 6 of his brief.

. We do note the record shows Mrs. Pate was a registered voter entitled to vote in the November 20 election. She relied on the registrar in casting her absentee by mail-vote. Once she turned in her absentee ballot, she no longer was entitled to vote at the polls.
Mrs. Fowler, stipulated to be a qualified voter who voted, cast a mail-in absentee ballot that she properly requested. It bore her signature, but lacked the signature of either a notary or two witnesses. The trial court concluded that her ballot should have been included in the 43 mail-in votes that were disallowed by the election commissioners. Although we do not answer the question of the validity of Mrs. Fowler's ballot, it appears that her ballot would have been valid under Alabama absentee voting law. See Roe, supra at 676 So.2d 1224-25.