755 So.2d 206 (2000)
David G. ADKINS
v.
Lester Shields "Buddy" HUCKABAY, III, Sheriff; W. Fox McKeithen, Honorable Secretary of State; the Honorable Jerry Fowler, Commissioner of Elections.
No. 99-C-3605.
Supreme Court of Louisiana.
February 25, 2000.
*207 Chris J. Roy, Sr., Jacques Maurice Roy, Alexandria, Counsel for Applicant.
*208 Sheri Marcus Morris, Merietta Spencer Norton, Baton Rouge, Edwin Henry Byrd, III, Robert A. Dunkelman, Pettiette, Armand, Dunkelman, Woodley, Byrd & Cromwell, Coushatta; James Guenard Bethard, Bethard & Bethard, Shreveport; Celia R. Cangelosi, Baton Rouge, Carey Thompson Jones, Denham Springs, Counsel for Respondent.
KNOLL, Justice.[*]
This is an election contest arising from the runoff election for sheriff of Red River Parish. The sole issue presented for our determination is whether the absentee voting irregularities complained of render it impossible to determine the outcome of the election. In deciding this issue, we are called upon to determine whether we will apply strict compliance or substantial compliance to the absentee voting law. After a careful and thorough review of the record and study of the law, we conclude for reasons expressed below that we will apply the standard of substantial compliance to the absentee voting law, and that under this standard, one mail-in ballot and four personally hand-delivered ballots fail to substantially comply with the essential requirements of the absentee voting law and that those irregularities adversely affected the sanctity of the ballot and the integrity of the election making it impossible to determine the winner.[1] Accordingly, we reverse and set aside the judgment of the court of appeal, reinstate the judgment of the trial court vacating the election, and order a Special General Election between the candidates.

FACTS
On November 20, 1999, a runoff election for Sheriff of Red River Parish was held between David G. Adkins ("Adkins") and Lester Shields "Buddy" Huckabay, III ("Huckabay"). A margin of three votes decided the election. Adkins received 2,246 votes while Huckabay received 2,249 votes. Of this total, Adkins received a majority of the votes cast at the polls on election day receiving 2,075 votes to Huckabay's 1,941. Huckabay, however, received a majority of the absentee votes receiving 308 to Adkins's 171. When the parish Board of Election Supervisors ("Board"), composed of Judith Huckabay (the Clerk of Court and wife of defendant Sheriff Huckabay),[2] Lynda H. Kile (the Registrar of Voters), and Ed Lester, met to begin tabulating and counting the absentee ballots, Donald Browne, as representative for Adkins, objected to all of the absentee ballots not properly executed in conformity with La. R.S. 18:1306,:1309,:1310. Mr. Browne testified that during the counting of absentee ballots and after Mr. Lester agreed that all ballots not properly executed, i.e., those ballots that were not notarized or witnessed by two people, should be thrown out, Mrs. Huckabay called the Commissioner of Elections Office. Because of the challenge and the call, the Board voted to invalidate forty-three of the mail-in absentee ballots that were not properly executed; however, the Board voted not to throw out the walk-in ballots for failure of proper execution. Mr. Browne re-urged his challenge to preclude all ballots, including walk-in absentee ballots, not properly executed. Further, Mr. Browne requested to see each ballot individually to make a challenge. However, Mrs. Huckabay, as Chief Election Officer, denied the request, stating "we have always done things this *209 way and we are going to continue doing it this way."[3] Thus, the remaining absentee ballots were counted in the official returns. Based on all the irregularities, Adkins brought a timely election suit seeking to be declared the winner or to void the results of the election and have a new one ordered.[4]

PROCEDURAL HISTORY
This matter was tried in open court in December 1999, over the course of six days. The trial court,[5] after considering the testimony, the evidence, and the arguments, set aside and vacated the results of the election and ordered a Special General Election for February 5, 2000, between Adkins and Huckabay. The trial court found that Mr. Browne exercised due diligence in challenging all absentee ballots, mail-in and walk-in, that were not properly executed or facially invalid, expressing doubt that he had free access to the ballots as suggested by the defendants.[6] Thus, considering the law and Mr. Browne's challenge, the court found that while there was no evidence of fraud, it was incumbent upon the Board at least to look at the face of the absentee ballots for irregularities.[7] Based on its review of the contested ballots, the court concluded that because of the serious irregularities, thirty-eight votes were invalid and should not have been counted.
The Court of Appeal, Second Circuit, reversed the judgment of the trial court and declared Huckabay the winner of the runoff election. In reversing the trial court, the appellate court concluded that Louisiana's absentee voting statutes, enacted pursuant to a constitutional mandate, should not be strictly construed. Instead, the court of appeal reasoned that where the electors have substantially complied with the absentee voting law and the irregularities complained of do not adversely affect the sanctity of the ballots or the integrity of the election, courts should not disenfranchise those electors. The court found that while there were irregularities in this case, they were unintentional and harmless. Thus, the court concluded that all the ballots the trial court disqualified, except two, substantially complied with the law. As for the two votes, the court pretermitted any discussion on them noting that because the margin of victory was three addressing these two votes was not necessary. Adkins v. Huckabay, 33,593, 749 So.2d 900, 909, 1999 La.App. LEXIS 3634, at *25-26 (La. App. 2 Cir. 12/23/99). We granted certiorari to consider the correctness of the court of appeal's judgment. Adkins v. Huckabay, 99-3605, 753 So.2d 222, 2000 La. LEXIS 198, at *1 (La.1/19/00).

LAW AND ANALYSIS

DUE DILIGENCE
We begin our discussion by starting with whether Adkins or his representative *210 Donald Browne, a former Louisiana State Trooper,[8] exercised due diligence in challenging all absentee ballots, mail-in and walk-in, that were not properly executed or facially invalid in the runoff election. The Election Code provides that "[d]uring the counting and tabulating of absentee ballots, any candidate or his representative, member of the board, or qualified elector may challenge an absentee ballot for cause, other than those grounds specified in R.S. 18:565(A)." La. R.S. 18:1315(B). Further, it provides that "[a]n objection to the qualifications of a voter, except for an objection to a voter who should have been removed from the voter registration rolls pursuant to R.S. 18:173, or to an irregularity in the conduct of the election, which with the exercise of due diligence could have been raised by a challenge of the voter or objections at the polls to the procedure, is deemed waived." La. R.S. 18:1315(B).
The defendants contend that Mr. Browne's "blanket challenge" was insufficient and that he should have individualized his challenges. The trial court found that Mr. Browne exercised due diligence in challenging all absentee ballots and expressed doubt that he had free access to the ballots as suggested by the defendants. Our review of the record clearly supports this finding. Mr. Browne testified that when he arrived at the courthouse, he was told that the mail-in absentee ballots were in one box and the walk-in absentee ballots were in another. He could not confirm this because he did not get to look at the ballots. Because of a concern regarding possible fraud with absentee ballots, Mr. Browne showed Mr. Lester a blank absentee envelope and pointed out that it clearly stated "Must be notarized or signed by two witnesses." He then told Mr. Lester that without the ballots being notarized or witnessed, the election would be left open to total fraud or corruption. When the Board began counting the ballots, Mr. Browne informed Mrs. Huckabay that he wanted to make some challenges. Mrs. Huckabay questioned on what grounds he was challenging. He stated that he was challenging the votes of Mrs. Sandra Kay Huckabay and John Henry McDonald on the grounds that they voted in person at the polls and absentee. Mrs. Huckabay responded that there were two John Henry McDonald's and discussed Sandra Huckabay's ballot. The opening of the absentee ballots then began again, at which point Mr. Browne again stated that he wanted to challenge all ballots not properly executed. He also stated that he was not allowed to look at any of the ballots Mrs. Huckabay was preparing for counting. As Mrs. Huckabay was separating the ballots, Mr. Lester noticed his wife's absentee ballot, which was not witnessed or notarized, and stated that if it was not counted there would be a lawsuit.
After some conversation regarding Mr. Browne's challenge, Mrs. Huckabay telephoned the Commissioner of Elections' office to seek advice. The Board then met and voted to reject forty-three mail-in absentee ballots, which had been chosen and separated from the other mail-in absentee ballots by Mrs. Huckabay and her two assistants that were facially invalid in that they were not properly executed, and to accept as valid all walk-in ballots. These forty-three absentee ballots were the only ballots Mr. Browne was allowed to see and count. Mr. Browne reurged his challenge to all remaining absentee ballots, mail-in and walk-in, not properly executed, which was denied. He then asked to see each ballot so he could make individual challenges, which was denied. The reason given by Mrs. Huckabay was that this was the way they had always done things, that they were going to continue to do things this way, and that they would be there all *211 night and into the next day if they allowed him to inspect each ballot individually.[9]
Clearly, Mr. Browne as representative of Adkins timely challenged all the absentee ballots and exercised due diligence in that challenge. He was prevented by Mrs. Huckabay from making any further individual challenges. That the Board considered Mr. Browne's challenge sufficient to cover both walk-in and mail-in absentee ballots is evidenced by Mrs. Huckabay's call to the Commissioner of Elections and its vote on the challenge. The defendant's argument lacks merit and the trial court was not manifestly erroneous or clearly wrong finding the challenge sufficient.

ABSENTEE VOTING
The right of qualified citizens of Louisiana to vote and to have their votes counted, inherent in our republican form of government and the democratic process, is a fundamental and constitutionally protected right. As such, the Louisiana Constitution provides that "[e]very citizen of the state, upon reaching eighteen years of age, shall have the right to register and vote." LA. CONST. art. I, § 10(A); see also U.S. CONST. art. IV, § 4. To fulfil this right, the Constitution instructs the Legislature to "adopt an election code which shall provide for permanent registration of voters and for the conduct of all elections" and to "provide a method for absentee voting." LA. CONST. art. XI, §§ 1, 2. The constitutional grant of the right to vote along with a direction to establish a code, i.e., the rules, procedures, and methods to accomplish that right, in general language evidences an intent that the Legislature has broad powers to legislate the conduct, the when, where, and how, of the election process.
In keeping with this mandate, the Legislature established Chapter 7 of the Election Code delineating the provisions relative to absentee voting. In Louisiana, absentee voting is the process by which electors unable to vote in person at their polling place on election day cast a ballot by either (1) voting in person; or (2) voting by mail. La. R.S. 18:1307, :1309. Here, the Legislature has seen fit to prescribe the when, where, and how absentee voting is to take place. The tenor of that chapter clearly specifies those entitled to vote absentee and the procedures to be utilized when an elector is unable to personally vote at the polls on election day. A reading of those sections, expressing the exceptions and limitations, makes clear that absentee voting is not an absolute right. Instead, it is an exception to the traditional method of voting at the polls and is restricted to specifically enumerated situations and qualifications.
La. R.S. 18:1303(A) delineates which electors, who are otherwise qualified to vote, may vote absentee in person. It limits voting absentee in person to:
(1) A person who expects to be absent from the parish in which he is qualified to vote on election day;
(2) A person who expects to be hospitalized on election day or a person who expects to be hospitalized and released prior to election day but who expects to be restricted to his bed by his physician on election day.
(3) A member of the United States Service, as defined in R.S. 18:1302, and his spouse and dependents, who expect to be out of the parish on election day;
(4) A student, instructor, or professor in an institution of higher learning located outside the parish in which he is qualified to vote and who lives outside of said parish by reason thereof, and his spouse and dependents accompanying *212 and residing with him, who expect to be out of the parish on election day;
(5) A minister, priest, rabbi, or other member of the clergy assigned to a religious post outside of the United States and his spouse and any dependents accompanying and residing with him, who expect to be out of the parish on election day;
(6) A person residing outside the United States who expects to be out of the parish on election day;
(7) A person who, after the registration books have closed as required by R.S. 18:135, has moved his residence to another parish, and the new residence is more than one hundred miles from the parish seat of the parish of his former residence, in which case he may vote by absentee ballot in the parish of his former residence;
(8) Repealed by Acts 1993, No. 418, § 2, eff. Jan. 1, 1994.
(9) A person involuntarily confined to an institution for mental treatment who is not interdicted and judicially declared mentally incompetent; or
(10) A person who, by virtue of his employment or occupation, expects to be out of his parish of registration on election day or who by virtue of his employment or occupation expects to be out of his precinct of registration and upon the waters of the state on election day; or
(11) A disabled voter, as provided in R.S. 18:1304.
(12) A person who declares to the registrar that tenets of his religion require his attendance at religious services on election day, prevent him from affixing his signature on any ballot or registration rolls on an election day, or otherwise prevent him from casting his ballot on election day.
(13) A clerk of court, registrar of voters, or a person who is employed by the secretary of state, the commissioner of elections, a clerk of court, or registrar of voters and who, by virtue of his employment, expects to be unable to go to his polling place on election day to cast his ballot.
(14) A person serving as commissioner-in-charge, commissioner, or alternate commissioner for an election in a precinct other than the precinct in which he is registered to vote.
(15) A person who is sixty-five years of age or older.
(16) Any person who has registered by mail who has not previously voted in any election.
Even more restrictive, the Code provides that an otherwise qualified elector who expects to be out of the parish on election day, may vote absentee by mail only if he is:
(1) A member of the United States Service, as defined in R.S. 18:1302, and his spouse and dependents;
(2) A student, instructor, or professor in an institution of higher learning located outside the parish in which he is qualified to vote and who lives outside of said parish by reason thereof, and his spouse and any dependent accompanying and residing with him;
(3) A minister, priest, rabbi, or other member of the clergy assigned to a religious post outside the parish in which he is registered and his spouse and any dependents accompanying and residing with him;
(4) A person who is or who expects to be temporarily outside the territorial limits of the state or absent from the parish in which he is qualified to vote during the absentee voting period and on election day;
(5) A person who, after the registration books have closed as required by R.S. 18:135, has moved his residence to another parish and the new residence is more than one hundred miles from the parish seat of the parish of his former residence, in which case he may vote by absentee ballot in the parish of his former residence;

*213 (6) A person involuntarily confined in an institution for mental treatment outside the parish in which he is qualified to vote, who is not interdicted and not judicially declared incompetent;
(7) Repealed by Acts 1993, No. 418, § 2, eff. Jan. 1, 1994.
[or] (8) A person residing outside the United States.[10]
The Election Code also establishes the rules and procedures for the preparation and distribution of absentee ballots. Important to this case, La. R.S. 18:1306 provides in pertinent part:
D. An absentee ballot envelope shall have printed on its face in red bold face type:
FOR BALLOT ONLY
VIOLATION OF ABSENTEE VOTING LAWS VOIDS BALLOT
AND MAY RESULT IN CRIMINAL PENALTIES
VOTING AT POLLS AFTER VOTING ABSENTEE IS PROHIBITED
AND MAY RESULT IN CRIMINAL PENALTIES
E. (1) An absentee ballot envelope also shall have a perforated extension or flap below the sealing line, which shall bear a certificate prescribed by the secretary of state and approved by the attorney general. The certificate shall include but not necessarily be limited to:
(a) The full name and place of residence of the voter in Louisiana, including state, parish, ward, precinct, city, and street.
(b) The statement of the voter certifying that he applied for the ballot, marked the enclosed ballot(s) himself or that they were marked for him according to his instructions and in his presence.
(c) The statement of the voter that he is entitled to vote at the precinct he names.
(d) Authorization to the parish board of election supervisors to open the envelope and count his ballot.
(e) His mother's maiden name.
(f) An affidavit followed by a line for the signature of the voter, certifying that the statements made by him are true and correct and that the voter is aware of the penalties for knowingly making a false statement therein, which penalties shall be stated on the certificate.
(g) Spaces for the state and parish or county where it is executed, if executed outside the voter's parish of registration.
(h) A statement of the voter, if voting absentee in the registrar's office, that he has reviewed the eligibility requirements and is entitled to vote absentee in person.
(2) An absentee ballot envelope flap shall also contain lines for the signature of two witnesses. The voter may sign the certificate in the presence of two witnesses, who must also sign the certificate, and in such a case, the voter shall not be required to obtain the signature of a notary public, but his certificate shall be made under penalty of perjury for providing false or fraudulent information. Above the perforation and along the seal line the words "DO NOT DETACH FLAP" shall be printed.

*214 F. The secretary of state shall design and provide a standard notice advising the public of the causes which entitle a voter to vote by absentee ballot in person. The notice shall be furnished to each parish registrar of voter's office wherein absentee voting in person is being conducted. The registrar shall post the notice in a prominent location to allow prospective voters to review eligibility requirements for voting absentee in person.
In keeping with the mandatory limitations on absentee voting imposed by the Legislature, the Code provides that an elector qualified to vote absentee by mail must make an application to the registrar by letter over his signature setting forth: (1) the election(s) for which he requests an absentee ballot; (2) the reason for his request to vote absentee and attaching any supporting documents required by law; (3) the address to which the absentee ballot(s) shall be sent; (4) his voting ward and precinct, if known; and (5) if the elector requests a ballot for a general election be sent in addition to a ballot for the primary, he shall declare in writing to the registrar that he will be eligible to vote absentee by mail in the general election. La. R.S. 18:1307. If the application does not meet these requirements, the registrar shall not send an absentee ballot to an applicant. La. R.S. 18:1307. The registrar must receive the elector's application not earlier than sixty days or later than ninety-six hours before the close of the polls for the election for which it is requested, and the date received shall be noted thereon.[11] La. R.S. 18:1307.
The Code likewise specifies the rules and limitations for absentee application and voting absentee in person. Pertinent to the case at hand, the Election Code mandates that the qualified elector shall make his application and vote absentee in person from twelve days to six days prior to the election. La. R.S. 18:1309(A)(1) (emphasis added). Before being allowed to vote absentee in person, the registrar shall establish the elector's identity by requiring him to submit his current Louisiana driver's license, his current registration certificate, or other identification card. La. R.S. 18:1309(D). Then, the registrar shall hand to the qualified elector the ballot, ballot envelope, and the certificate provided in La. R.S. 18:1310(B), if needed. La. R.S. 18:1309(E)(2). The elector must sign the precinct register before executing the absentee ballot. La. R.S. 18:1309(E)(2). Then, the elector shall retire to a place within the area designated for the marking of ballots in secrecy and shall fill in the flap certificate and mark his ballot. La. R.S. 18:1309(E)(3). The elector must then fold his marked ballot and, without releasing it, the registrar shall detach the perforated slip from the ballot, after which the elector shall place it in the ballot envelope, seal it, and return it to the registrar or his deputy. La. R.S. 18:1309(E)(3). Before delivery of the precinct register to the parish custodian, the registrar shall enter the word "absentee" and the date of the election in the proper space on the precinct register for each qualified elector who voted absentee in person and absentee by mail whose ballot the registrar had received on or before the last day for voting absentee in person. La. R.S. 18:1309(G).
Regardless of whether the qualified elector receives his absentee ballot by mail or in person, the Code provides that the elector shall first fill in all blanks on the certificate on the ballot envelope flap, then mark the ballot according to the printed instructions on its face, then place the ballot in the envelope, seal the envelope, and sign the certificate on the ballot envelope flap. La. R.S. 18:1310(A). If the qualified elector is blind, physically handicapped, unable to read, or unable to write, *215 he may receive assistance in voting absentee from any person, other than a candidate. La. R.S. 18:1310(B)(1)-(2). Further, such a qualified elector may seek assistance in the signing of his name or making of his mark. La. R.S. 18:1310(B)(2). The person who assists such a qualified elector in signing his name or making his mark shall explain to the elector that his signature or mark certifies that all statements in the certificate are true and correct and that any person who knowingly provides false or incorrect statements is subject to a fine, imprisonment, or both. La. R.S. 18:1310(3).
We must first determine whether the provisions of the Election Code establishing the rules, procedures, and methods for absentee voting should be strictly construed so as to void ballots failing to strictly comply with the statutory provisions of the law or whether substantial compliance with the essential requirements of the law suffices. Primary to our inquiry is ensuring and maintaining the sanctity of the ballot and the integrity of the election, and protecting against the needless disenfranchisement of electors.
Adkins maintains that the failure of those absentee electors to follow the mandatory language of the Election Code rendered their ballots invalid and should have precluded their inclusion in the official counting and tabulation of the runoff election. Huckabay, joined by the State, counters that as long as the electors substantially comply with the provisions of the Election Code and the irregularities do not affect the sanctity of the ballot or the integrity of the election, the failure of election officials to perform their ministerial duties cannot disenfranchise these absentee electors.
Absentee balloting, and the statutes governing them, have proved challenging to the courts. Often in election contests, our courts are faced with the frustrating problems of irregularities in the absentee voting process caused by human errors that are not in compliance with precise statutory language. In most instances, fraud is not involved. The irregularities may be caused by sloppy practices and customs, a failure to understand the statutorily prescribed methods and procedures, or for any number of reasons that amount to good-faith inadvertencies. Although fraud may not be involved, the inquiry does not end. The courts are still faced with balancing the irregularities with statutory requirements so as not to unjustly disenfranchise an elector, to the extent that such tolerance of irregularities will not lead to a manipulation of an election or affect the integrity of an election or the sanctity of the ballot. The trial court wisely pointed out in his oral reasons for judgment the problems inherent in absentee voting: "[A]bsentee voting procedure is fraught with potential for abuse if the law and the procedure is [sic] not followed carefully, because it is hard to tell what happens sometimes." We are impressed with these noteworthy comments from the trier of fact who is not disadvantaged by the review of a cold record and who is in a superior position to observe the nuances of demeanor evidence not revealed in a record. Indeed, absentee voting is a critical area of concern because more often than not close elections, like the election at issue, are determined by the absentee votes and the margin for non-fraudulent human error in absentee voting is great.
We have researched this issue throughout the nation and see a split of authority among the states on how courts construe absentee voting statutes. Some states conclude that absentee voting statues must be strictly construed. See, e.g., Taylor v. Cox, 710 So.2d 406, 407 (Ala.1998) (holding that the language "shall be manually signed by the applicant" clearly meant that the elector must himself sign the application for absentee ballot form); Lewis v. Griffith, 664 So.2d 177 (Miss.1995) (holding that Mississippi requires strict compliance with the absentee ballot statutes); Tiller v. Martinez, 974 S.W.2d 769 (Tx.Ct.App. 4th Dist.1998) (holding that the manner and *216 procedure of casting absentee ballots are mandatory and directed by statutory requirements and that votes are void and should not be counted if the evidence shows that the electors did not follow procedural statutory requirements in the casting of absentee ballots). The reasoning behind strict compliance is that the Legislature, by enacting statutes with mandatory, and not directory, language, i.e., "shall," intended strict compliance with the absentee voting law to prevent fraud and to preserve the purity and integrity of elections.
The majority of states, however, have concluded that the absentee voting laws should be liberally construed in aid of the right to vote. Thus, it has been held that where there has been substantial compliance with the provisions of the absentee voting laws and a free expression of the electors' will, courts will not nullify votes such that the electors are disenfranchised. See, e.g., Erickson v. Blair, 670 P.2d 749, 755 (Co.1983) (rejecting the rule of strict compliance and adopting a standard of substantial compliance); McCavitt v. Registrars of Voters of Brockton, 385 Mass. 833, 434 N.E.2d 620, 623 (1982) (holding that unless the elector substantially fails to comply with the absentee voting laws his absentee ballot must be counted); Beckstrom v. Volusia County Canvassing Bd., 707 So.2d 720, 724-25 (Fla.1998) (confirming that substantial compliance with the absentee voting law is all that is required to give legality to the ballot); Cure v. Board of County Commissioners, 263 Kan. 779, 952 P.2d 920, 923 (1998) (holding that a substantial compliance with the law regulating the conduct of elections is sufficient, and when the election has been held and the will of the electors has been manifested thereby, courts should uphold the election although there may have been attendant informalities and in some respects a failure to comply with statutory requirements); Eubanks v. Hale, 752 So.2d 1113, 1999 Ala. LEXIS 306, at *44 (Ala.1999) (affirming its adherence to the substantial compliance rule).
A review of our case law reveals that while election cases have proven difficult, we have been almost unanimous in the standard to which we hold electors and election officials. For example, in Hendry v. Democratic Executive Comm., 128 La. 465, 54 So. 943, 943 (1911), we held that, where the law required that the elector "shall" designate his choice by stamping or marking to the right of the name of the candidate on his ballot, a ballot stamped on the left side was invalid. In reaching this conclusion we noted that "form is sacramental" and stated that "[w]hile the intent of the voter is material in determining the validity and effect of ballots, yet such intent, in order to be effectuated, must be expressed conformably to the imperative requirements of the law."
In Hart v. Picou, the issue was whether the failure to print and use ballots with numbered and detachable slips as required by law required the voiding of the election. 147 La. 1017, 86 So. 479, 479 (1920). There, because of error attributable only to election officials, ballots were printed that did not strictly comply with the mandatory provision of the law, i.e., the ballots were not numbered and did not have a detachable slip. In evaluating this provision, we noted that among its purposes was to ensure secrecy in the ballot and to guard against the possibility of fraud. Considering this, we concluded that the provisions were not merely directory or that the failure to observe it must be accompanied by some proof of fraud. Instead, we held that these provisions were mandatory and the failure to observe them rendered those ballots illegal and the entire election void. Id. at 480.
In regard to absentee voting law, where an elector obtained an absentee ballot from the printer instead of from the clerk of court as required by law, we concluded that the ballot should be rejected and not counted. Vidrine v. Eldred, 153 La. 779, 96 So. 566, 568 (1923). There was no question that the elector was a qualified *217 voter or that he voted his will. Instead, because the elector failed to follow a mandatory provision of the absentee voting law, we disallowed the vote. We also stated that "where the electors have had a fair and free opportunity to express their will at the polls, and have done so, the result of their choice will not be set aside because of the failure of some ministerial officer to perform some duty imposed upon him by law, or in the manner prescribed for his guidance." Id. at 567.
In Duncan v. Vernon Parish. Sch. Bd., 226 La. 379, 76 So.2d 403 (1954), the election was contested on irregularities including: (1) that the list of voters furnished by the registrar of voters to the commissioners of election contained many omissions and errors; (2) that the commissioners were not sworn as provided by law; (3) that the election polls remained open after the hour fixed for closing; (4) that no voting booths were provided for the voters and there was no opportunity for electors to prepare their ballots in secrecy; and (5) that forty-eight ballots were prepared and signed for the voters by other persons. There was no allegation that these forty-eight votes could have changed the outcome of the election or allegation of fraud. In affirming the election, we noted that the plaintiff had failed to show that these irregularities "deprived the electors of votes sufficient in number to have changed the result of the election" and that in "the absence of such allegations the election will not be set aside solely because of the failure of some ministerial officer to perform some duty imposed upon him or to follow every formal direction prescribed by law." Id. at 404.
In Smith v. Washington Parish Democratic Comm., 239 La. 827, 120 So.2d 257 (1960), we were faced with an election contest with a margin of victory of 136 votes. Here, the plaintiff based his case upon the contention that where the commissioners of the election failed to perform any of their ministerial duties such as entering of dates, signing the registration certificate after the elector, or filling in all of the poll lists properly, the election must be annulled if the number of votes where these oversights occur exceeds the difference in the vote between the two candidates. We disagreed and concluded that "in the absence of fraud, mere failure of election officials to perform a ministerial duty will not warrant the setting aside of the election." Id. at 260. We also stated that "to contest an election, not only specific frauds or irregularities must be alleged, but it must also be shown that the frauds or irregularities charged did in fact alter the result." Id. at 261. Having found only three votes that should not have been counted, we affirmed the dismissal of plaintiffs case. Id. at 262.
In Johnson v. Sewerage Dist. No. 2 of Caddo Parish, 239 La. 840, 120 So.2d 262, 270-71 (1960), this Court disposed of a multitude of alleged ministerial irregularities ranging from swearing in of commissioners to the canvassing of the returns wherein we stated "in the absence of fraud, corruption or proof that the irregularities complained of would have changed the result of the election, the election will not be set aside solely because of the failure of some ministerial officer to perform every formal direction prescribed by law." In reasoning what degree of compliance the electorate should be made to follow we quoted "`the election laws of the state must, of course, be observed with some degree of reasonableness; but it was never in contemplation that the carelessness or ignorance of election officials should afford the means of defeating the will of the people in the exercise of their highest prerogative.'" Id. at 271 (quoting Bradford v. Grant Parish Sch. Bd., 154 La. 242, 97 So. 430, 431 (1923)). Finding the law and facts contrary to plaintiff's contention, we affirmed the election.
Finally, in Garrison v. Connick, 291 So.2d 778, 781 (La.1974), the parties were candidates for Orleans Parish District Attorney in the Democratic primary election. Plaintiff received 62,731 votes to defendant's *218 64,952, a margin of 2,221. As such, Connick was declared the party's nominee. Plaintiff instituted suit alleging 2,369 votes were fraudulently or illegally cast. The lower courts granted defendant's exception of no cause of action because plaintiff had failed to name the 2,369 electors. We reversed and remanded for further proceeding finding that requirement unnecessary. Id. at 781. In reaching this conclusion we quoted the following:
As a general proposition it may be stated that, in the absence of specific facts giving rise to fraud or which cast uncertainty on the result, irregularities in an election will not affect the validity of a nomination or serve to nullify the result ...; but the rule is otherwise if a contestant is able to show, upon allegations of specific fraud and irregularities, that but for such fraud and irregularities he would have received a majority of the legal votes cast ...; and, as an alternative, it has been recognized that if the Court finds the proven frauds and irregularities are of such a serious nature as to deprive the voters of the free expression of their will, it will decree the nullity of the entire electioneven though the contestant might not be able to prove that he would have been nominated but for such fraud and irregularities....
Id. (quoting Dowling v. Orleans Parish Democratic Comm., 235 La. 62, 102 So.2d 755 (1958)) (internal quotations omitted).
A review of the jurisprudence makes clear that almost without exception this Court has never required strict compliance with our election laws. Both interpretations have their inherent strengths and weaknesses. The weaknesses in strict compliance, however, are too unforgiving, attendant with harsh consequences. More often than not, electors would be unreasonably disenfranchised necessitating setting aside elections more frequently for the slightest good-faith error. The same objectives can be accomplished with substantial compliance which means actual compliance with respect to the provisions essential to the reasonable objectives of the absentee voting law. After having fully weighed both, we conclude that, in the absence of legislative direction to the contrary, Louisiana's absentee voting law does not require strict compliance. We find substantial compliance a more just and reasonable approach in resolving the problems posed by irregularities in absentee voting. Thus, in the absence of fraud, undue influence, or intentional wrongdoing, an absentee ballot must be counted unless there is a substantial failure to comply with the essential requirements of the absentee voting law and that irregularity adversely affects the sanctity of the ballot and the integrity of the election.[12]
We hasten to add, however, that courts are not powerless to overturn elections where irregularities are present. See La. R.S. 18:1432. Absentee voting should be done in conformity with the Election Code as such statutes are not designed to ensure a vote but rather to permit a vote by a statutorily limited and prescribed method. We will not sanction irregularities that circumvent the plain purpose of the law and open the door to the possibility of manipulation of elections. Nonetheless, whether an irregularity substantially complies with an essential provision depends on the intimacy of the relation between the provision and the general purpose it serves to accomplish, the nature and extent of the departure, and whether violence will be done to the legislative scheme. The substantial compliance standard, more often than not, preserves the enfranchisement of qualified electors who are unable to attend the polling place on election day for specified reasons, preserves secrecy of the ballot, prevents fraud, undue influence, and intentional *219 wrongdoing upon the system, and achieves a reasonably prompt determination of the result of the election.[13] Having clarified this standard, we now turn to the case sub judice.

MAIL-IN ABSENTEE BALLOTS

Josie Mae Fowler
Mrs. Fowler, a qualified voter, timely requested, cast, and returned a mail-in absentee ballot. It bore her signature, but lacked the signature of either a notary or two witnesses as required by La. R.S. 18:1310.[14]
The Board, after phoning the Commissioner of Elections' office, voted to exclude all mail-in absentee ballots that were not properly executed. Through error, the Board did not exclude this ballot and counted its votes. The trial court concluded this ballot was erroneously counted as it bore the same irregularity as the forty-three votes the Board voted to disqualify. The court of appeal pretermitted any discussion on this vote. Allowing this ballot to be counted for the same violation as the forty-three ballots the Board voted to exclude would be to enfranchise Mrs. Fowler and disenfranchise forty-three electors for the same violation. Thus, we find the trial court correctly disqualified this vote.

THE "4" HAND-DELIVERED VOTES
In paragraph six of Adkins' original petition, he contested the validity of the votes of Elvie Robinson, Claude Pate, Martin Green, and Jocille Kellogg. Before any ballots were personally hand delivered, the record shows that on November 18, 1999, Ms. Kile was engaged in a conversation, unrelated to any official law-enforcement business, by Sheriff Huckabay and Chief Deputy Warren Perkins in her office. She testified that Sheriff Huckabay stated to her that several people were not getting their mailed absentee ballots and that there was going to be a lawsuit filed. As a result of this conversation, she stated that she delivered absentee ballots to at least these four electors.[15] The last day to vote absentee in person was November 13, 1999. The last day for the registrar to receive a request for a *220 mail-in absentee ballot was four days before the election, or November 16, 1999.[16]
The parties stipulated that on November 18, 1999, Ms. Kile drove to the homes of these four electors and personally hand delivered absentee ballots to them. Mr. Green and Ms. Pate voted in Ms. Kile's presence and Ms. Kile kept these ballots overnight in her car and then showed the ballots as voted on November 19, 1999, by executing the "flap" portions of the ballots. With respect to Ms. Pate's ballot, she did not make a request for the November 20th general election. In the precinct register under her name, it indicates a precinct and ward of "3-2," an "H" in the assistance column,[17] and she requested an absentee ballot for the October 23, 1999, primary election only. With respect to Mr. Green, there was a mail-in ballot request for the November 20th general election and his absentee ballot has only one witness signature on the top witness line. Ms. Kellogg and Ms. Robinson did not vote in the presence of Ms. Kile; rather, those ballots were left with these electors and were shown to have been executed on November 19, 1999. With respect to Ms. Kellogg, she made a mail-in ballot request for the November 20th general election. Her son-in-law, Mr. Jackie Williamson, returned Ms. Kellogg's ballot to the Registrar's office. With respect to Ms. Robinson's ballot, someone returned it to the Registrar's office other than Ms. Kile, Sherry Perkins and Bernadette Hill witnessed it, she did not make a request for the November 20th general election mail-in absentee ballot application, and the assistance column indicates a "B." Despite the failure of Ms. Robinson to submit an application over her signature for a mail-in absentee ballot for the November 20th general election, according to the voting register she was mailed an absentee ballot on November 9, 1999. However, Ms. Robinson, on a date unclear by the record, returned the November 20th absentee ballot to the Registrar's office because of an error in one of the punch cards.
In resolving how to address the irregularities in these four challenged ballots, we are unable to apply the absentee voting requirements provided by law as these ballots do not qualify as either in-person or mail-in absentee ballots under the Election Code. Without going into the detailed deficiencies on each ballot, the primary irregularity that disqualifies these votes is that these four ballots were personally hand delivered to the electors by the registrar of voters after the deadline had passed for either statutory provision. There simply is no provision in law for this occurrence.
We note that none of the electors who were personally hand delivered these ballots contacted the Registrar's office on this day and questioned the whereabouts of their mailed absentee ballots; instead, this action was taken only at the behest and insistence of one of the candidates, Sheriff Huckabay, under the threat of a lawsuit.[18] This created a situation whereby ballots were actually delivered and marked outside the registrar's office past the deadline for in-person absentee voting and past the deadline for requesting mail-in absentee ballots, ballots were left overnight in a vehicle while others were left with the electors or others, and ballots were returned to the registrar's office by someone other than the electors or the registrar.
Other than declarations by Ms. Kile, there is not a record of the occurrences involved in these ballots and certainly *221 there is not a record that complies with the statute of how these ballots were delivered, returned, executed, and recorded. The statute creates specific and necessary requirements that must be substantially followed in order for absentee ballots to count. A violation of voting procedures which amounts to such a total departure outside the law from the essential provisions of the absentee voting statutes cannot be tolerated.
Clearly, the hybrid procedure employed by Ms. Kile falls outside the law. We will not allow the Election Code to be set aside and new procedures innovated, albeit in good faith, to cover errors of omission or commission, or to accommodate an eager candidate or elector. The line is drawn at substantial compliance with the positive law. We are unable to balance these irregularities with the statutory requirements because there is no positive law for reference. A tolerance of such deviations from legal requirements could lead to a manipulation of elections, and affect the integrity of an election and the sanctity of the ballot. These four votes must be disqualified. Thus, we find the trial court correctly disqualified these four votes and will reinstate its ruling.[19]

CONCLUSION
While the court of appeal applied the substantial compliance standard to the irregularities at issue in this election contest, with which we agree, we find that it erred in its application of this standard by concluding that the contested ballots did substantially comply with the essential provisions of the Election Code finding that they were simply good faith, unintentional errors. Although fraud was not involved, the court must still analyze the irregularities with statutory requirements so as not to unjustly disenfranchise an elector, to the extent that such tolerance of the irregularities will not lead to a manipulation of an election or affect the integrity of an election or the sanctity of the ballot. A good faith finding does not supplant substantial compliance as the standard; regardless, there still must be substantial compliance with the essential provisions of the Election Code. We find that in applying substantial compliance to five of these irregularities, the trial court correctly vacated the general election and set it aside. We will reinstate its judgment.
We conclude that the votes of Josie Mae Fowler, Elvie Robinson, Claude Pate, Martin Green, and Jocille Kellogg failed to substantially comply with the essential provisions of the absentee voting law.[20] As such those ballots are disqualified and should not have been included in *222 the counting of the absentee ballots. We must reverse. However, because of the constitutional guarantee to secrecy of the ballot and the fact that the margin of victory in the November 20th runoff election was three votes, it is impossible to determine the result of this runoff election. La. R.S. 18:1432 provides: "If ... in an action contesting an election [the court] determines that: (1) it is impossible to determine the result of election, ... the [court] may render a final judgment declaring the election void and ordering a new primary or general election for all the candidates...."[21] Because it is impossible to determine the results of this election, we must order a new general election between the candidates David G. Adkins and Lester Shields "Buddy" Huckabay, III.[22]

DECREE
Accordingly, for the foregoing reasons, the judgment of the court of appeal is hereby reversed and set aside. The judgment of the trial court setting aside and vacating the results of the general election held on November 20, 1999, is hereby reinstated.[23] It is hereby ordered that a Special General Election be set for April 15, 2000, between the candidates David G. Adkins and Lester Shields "Buddy" Huckabay, III. The precinct registers to be used at said Special General Election shall include all persons registered to vote on March 15, 2000. If not already done, the Secretary of State is hereby ordered to direct the Commissioner of Elections to clear all voting machines used in Red River Parish for the November 20, 1999, election. All costs of these proceedings are assessed against the appellee, Sheriff Huckabay. REVERSED; SPECIAL GENERAL ELECTION ORDERED.
VICTORY, J., concurs.
LEMMON, J., concurs and assigns reasons.
JOHNSON, J., subscribes to the opinion and assigns additional concurring reasons.
MARCUS and KIMBALL, JJ., dissent and assign reasons.
LEMMON, J., Concurring.
I agree with the majority that challenges to absentee votes should be judged on the basis of standard of substantial compliance with the statutes. I also agree that the majority properly disqualified the *223 mail-in ballot of Josie Mae Fowler.[1] However, I do not entirely agree with the majority's reasoning as to the four ballots that were hand-delivered by the registrar and disagree as to disqualifying two of those votes.
La.Rev.Stat. 18:1307 requires a person, who is qualified to vote by mail and desires to do so, to make application to the registrar of voters by a letter, over the voter's signatures, that may be delivered to the registrar by any means. Such an application must set forth certain information and must be received by the registrar not later than ninety-six hours before the close of the polls for the election (in this case, not later than 8:00 p.m. on Tuesday, November 16, 1999).
I disagree with the theory of the trial court, apparently adopted by the majority of this court, that the registrar, after mailing a ballot to a voter in response to a timely and otherwise proper application to vote by mail and after being notified that the voter has not received the ballot,[2] cannot validly hand-deliver the ballot to the voter. At least when the registrar simply leaves the ballot with the voter or someone in the voter's household and the voter thereafter casts his or her vote and returns the ballot or causes the ballot to be returned to the registrar just as if the ballot had been received by the voter by mail, hand-delivery of the ballot by the registrar should not automatically invalidate the ballot.[3] Instead, each case of hand-delivered ballots should be analyzed separately. Of the four hand-delivered ballots here at issue, only those of Claude Pate and Elvie Robinson should be disqualified.

Claude Pate
Claude Pate requested a ballot to vote by mail in the primary election only; she never made a written request to vote by mail in the general election. Therefore, even though Pate's relative made a telephone request of the registrar for a general election ballot, the ballot that she received and voted cannot be counted, not because the registrar hand-delivered the ballot, but because the voter did not make a written request that included the information required by La.Rev.Stat. 18:1307 A.[4]

Elvie Robinson
Elvie Robinson, who was homebound, requested a ballot to vote by mail in the primary election only; although the Code permits a voter to request a mail-in ballot for the general election at the same time that the voter requests a primary election ballot, Robinson did not do so. Nevertheless, the registrar also mailed her a ballot on November 9 for the November 20 general election, but the ballot contained the wrong police jury district, and Robinson's son returned the incorrect ballot. Because there was insufficient time to mail Robinson a correct ballot, the registrar hand-delivered *224 the correct ballot to Robinson on November 18. After the registrar left, Robinson voted the ballot and had her relative return the ballot to the registrar's office.
The court of appeal reasoned that Robinson's vote was valid because Robinson likely would have requested a general election ballot if the registrar had not already sent her one by mistake. The court of appeal bolstered that conclusion by noting that "Ms. Robinson's return of the improper ballots may be viewed a request for an absentee ballot for the general election, and any untimeliness of that request is minimized by the fact that the whole situation was the fault of the registrar and not of Ms. Robinson." 33,593 at p. 13 (La. App.2d Cir.12/23/99), 749 So.2d 900.
I would agree with the court of appeal that Robinson's return of the improper ballot might be viewed under appropriate circumstances as a request for a general election ballot. However, there were several deficiencies.
First, the Code requires a written request, and an unwritten, implied request is not sufficient. This record contains no evidence of a writing over Robinson's signature, as required by La.Rev.Stat. 18:1307 A, that can be construed as an application to vote by mail. Moreover, the implied "application," based on the return of the improper ballot, does not contain any of the other information required by Section 1307 A, and Section 1307 E prohibits the registrar from "send[ing] an absentee ballot to an applicant whose application for an absentee ballot does not meet the requirements of Subsection A of this Section." Finally, it does not appear that the implied "application" was received by the registrar before 8:00 p.m. on November 16, the deadline for making a request to vote by mail.
In addition to these deficiencies, I distinguish Pate's and Robinson's votes from those of Jocille Kellogg[5] and Marvin Green.[6] Kellogg and Green did everything necessary to validly vote by mail, and the mistake of the registrar or the mailman or someone else caused the last minute situation that the registrar attempted to rectify. However, it was Pate, and not the registrar, who caused her last minute situation by not taking the proper steps to request a mail-in ballot for the general election.
As to Robinson, the dissenters and I disagree because, as I understand their position, the registrar's gratuitously sending her a general election ballot misled her into not making a timely written application. I disagree because Robinson had every opportunity under the Code to request a general election ballot along with her request for a special election ballot. She did not request a general election ballot then and still had not done so when *225 she received the improper ballot sometime (not shown in the record) after it was mailed on November 9. Because November 16 was the deadline for the registrar's receipt of a proper written request, I cannot conclude that the registrar's mailing of an unrequested ballot misled Robinson into not making a proper written request that she otherwise would have validly made.
In summary, Robinson's absentee ballot did not substantially comply with the Code and was properly disqualified because of her own inaction, which was not substantially affected by any action or inaction on the part of the registrar.
When the votes of Fowler, Pate and Robinson are disqualified, one cannot determine the result of the general election, and a new election must be held.
JOHNSON, J., Concurring.
I agree with the conclusion reached by the majority that it is impossible to determine the results of this runoff election, and because of this impossibility a new general election should be held between the candidates. I write separately to express my views on the application of La.Rev.Stat. Ann. 18:1432(A).
Since the adoption of our current Election Code, this Court has addressed the application of La.Rev.Stat. Ann. 18:1432(A) on two occasions. First, in Kelly v. Village of Greenwood, 363 So.2d 887 (La.1978), and most recently in, Savage v. Edwards, 98-2929 (La.12/18/98), 722 So.2d 1004. In Kelly, we determined that the statutory scheme in La.Rev.Stat. Ann. 18:1432 was in accord with the pre-election code jurisprudence which provided an alternative for candidates who could not prove that "but for" the irregularity he would have been elected. Under the pre-election code jurisprudence, it was recognized that "if the Court finds the proven frauds and irregularities are of such a serious nature as to deprive the voters of the free expression of their will, it will decree the nullity of the entire electioneven though the contestant might not be able to prove that he would have been nominated but for such fraud and irregularities." Garrison v. Connick, 291 So.2d 778, 781 (La.1974), quoting, Dowling v. Orleans Parish Democratic Comm., 235 La. 62, 102 So.2d 755 (1958).
Savage presented an opportunity for this Court to provide clear guidance to the lower courts on when an election may be declared void under La.Rev.Stat. Ann. 18:1432(A). Instead of seizing this opportunity to give direction to trial courts faced with fraud or irregularities, the Court relied on numerical calculations and concluded that "the number of votes proven to have been cast illegally or fraudulently was not sufficient to change the result of the election." Savage, 722 So.2d at 1004. While the case at hand presents the situation where the number of proven irregularities exceeds the margin of victory, I am still of the opinion that a trial judge is not limited to strictly numerical considerations in declaring an election void. See id. at 1007 (Johnson, J., dissenting). In determining whether to declare an election void under La.Rev.Stat. Ann. 18:1432(A), a judge can and should consider whether the proven frauds or irregularities are of such a serious nature so as to deprive the voters of the free expression of their will.
While the Louisiana Election Code provides no procedure for the disqualification of local election supervisors (Registrars of Voters, Clerks of Court, etc.), prudence would dictate that the State Commissioner of Elections, the State Board of Election Supervisors, or the Secretary of State provide some monitoring of the new general election ordered by this Court. A system of monitoring would ensure that the irregularities found in the prior election and the potential ethical conflicts created by the relationship between the Clerk of Court and one of the candidates (husband and wife) do not impact the new election.
MARCUS, Justice (dissenting).
In my view, the irregularities in the absentee voting did not rise to the level requiring the election to be set aside. I find substantial compliance with the law. *226 I would affirm the court of appeal. Accordingly, I respectfully dissent.
KIMBALL, J., Dissenting.
I agree with the sentiments expressed in Justice Lemmon's concurring opinion that hand delivery of absentee ballots by a registrar of voters should not automatically invalidate an otherwise validly executed ballot. I dissent, however, because I also find that the votes of Ms. Elvie Robinson and Mrs. Claude Pate were executed in substantial compliance with the Election Code. In my view, the controversy surrounding their votes was caused by an erroneous interpretation of the Election Code by the registrar of voters. In the absence of fraud, an error on the part of the registrar should not cause Mrs. Pate or Ms. Robinson, a homebound voter, to suffer the loss of having their otherwise valid votes not counted. The trial court specifically found there was no fraud in this election and, in my opinion, the requirement of substantial compliance has been met. I would therefore affirm the decision of the court of appeal and allow this election to stand.
NOTES
[*] Traylor, J., not on panel. See La. S.Ct. Rule IV, Part II, § 3.
[1] Because we conclude that these five votes failed to substantially comply with the essential provisions of the absentee voting law and the margin of victory in this case was three votes, we pretermit any discussion on the remaining absentee ballots challenged by Adkins, as such would be unnecessary for the resolution of this case.
[2] The record shows that Mrs. Huckabay was herself a candidate for re-election as Clerk of Court in this election, in which plaintiff was challenging her husband for reelection. Apparently, no one moved to recuse her from the vote counting process.
[3] (R. Vol. 2, at 256).
[4] La. R.S. 18:1401(B) provides in pertinent part:

A candidate who alleges that, except for substantial irregularities or error, or except for fraud or other unlawful activities in the conduct of the election, he ... would have been elected may bring an action contesting the election.
[5] Because of the recusal of Judge Lewis O. Sams, retired Judge Fred C. Sexton was appointed by Order of this Court as judge ad hoc of the Thirty-Ninth Judicial District Court, Red River Parish, for the purpose of hearing and disposing of this case.
[6] The trial court concluded: "I'm satisfied that Mr. Browne made a challenge and that he challenged all ballots which were not regular on their face. I think under his circumstances, it was going to be difficult to do more. And, frankly, I doubt that he had free access to the ballots." (R. Vol. 5, at 852).
[7] We find the trial court's observation telling:

"I will observe that there are irregularities, and then there are more serious irregularities. I will also observe that the absentee voting procedure, particularly the mail voting procedure, is fraught with potential for abuse if the law and the procedure is [sic] not followed carefully, because it's hard to tell what happens sometimes" (R. Vol. 5, at 855).
[8] We note that Mr. Browne's physical movement at the courthouse where the absentee ballots were counted was limited by the fact that he was rendered a paraplegic in the line of duty.
[9] Mr. Browne testified that as he continued to vigorously challenge all votes Mrs. Huckabay stated, "`We have always done it this way and we will continue to do it this way,'" (R. Vol. 2, at 233) and that "We would be there all night and until the next day if that was allowed and she was not going to do that. And I said that so be it, we needed to be here to make sure that every ballot is properly executed and the election cannot be challenged." (R. Vol. 2, at 235).
[10] La. R.S. 18:1303 also provides for absentee voting in special circumstances, not pertinent in this case. It allows absentee voting for sequestered jury members, other persons with special hospital exceptions, persons employed upon state waters who expect to be out of their precinct of registration and upon the waters of the state both during the absentee voting period and on election day, special handicapped persons, and certain incarcerated persons. La. R.S. 18:1304 also provides for absentee voting for electors who are physically disabled and for electors who suffer from a permanent physical disability.
[11] If the applicant is a member of the United States Service or resides outside the United States, he may use the federal postcard application, and it may be received from twelve months to seven days before election day. La. R.S. 18:1307(C).
[12] Our adoption of the substantial compliance standard is supported by La. R.S. 18:1401(B) which requires that a candidate contesting an election allege "substantial irregularities."
[13] It should also be noted that there are significant and telling differences between ballots cast at the polls and ballots cast by absentee voters. Electors who vote at the polls must come to the designated ward and precinct in person and cast their votes in the presence of election officials. Absentee electors, especially mail-in absentee electors, generally fill out their ballots some place else, outside the watchful eye. As such, the potential for fraud, undue pressure, or someone other that the elector completing the ballot is much greater. The legislative response to these potential abuses in absentee voting is its enactment of the intricate procedures to be followed by absentee electors and election officials.
[14] It is obvious that the requirement of either a notary or two witnesses to the signature is to verify that the purported signature is indeed the signature of the named elector on the ballot. Without this verification, the signature loses its proof of authenticity. The ballot is then easily susceptible to someone else forging the name of the elector or casting the ballot. This omission does violence to ensuring the integrity of the election and the door to fraud is flung wide. We find this requirement sacramental to the reasonable objectives of the absentee voting law. Thus, the failure to either notarize or have two witnesses to the elector's signature on the absentee ballot does not comport with substantial compliance and this vote must be disqualified. By requiring the elector himself apply for an absentee ballot, delineate his qualification to vote absentee, and to sign the application, the Legislature was apparently attempting to avoid the danger of allowing absentee ballots to be procured for fraudulent casting. Further, by requiring that the absentee elector sign his individual ballot and envelope flap, and have them either notarized or witnessed by two individuals, the Legislature was apparently attempting to avoid the danger of allowing absentee ballots to be cast fraudulently and to ensure the one vote per elector rule.
[15] In fact, the exact number of ballots Ms. Kile personally hand delivered is not known. In her sworn affidavit, Ms. Kile attests these were the only four she could remember at that time.
[16] A mail-in absentee ballot is consider timely if it is received on at least the day before the election. All absentee ballots received on or after election day are untimely and are not to be counted. La. R.S. 18:1312.
[17] The registrar uses several abbreviations to indicate a number of disabilities. "B" stands for homebound, "I" is for illiterate, "H" is for handicapped, and "N" stands for in a nursing home.
[18] An important question left unanswered by this record is how the registrar identified which electors she personally hand deliver ballots.
[19] As for these four votes, the trial court held in pertinent part:

[N]ow I'm to the four, and those are the people to whom the registrar delivered the ballots.... I do not believe the law contemplates that registrars should hand-deliver ballots.
I don't think it creates a problem if someone picks up a ballot for somebody else, and I believe that's allowed specifically under the new law. Of course, the registrar should take care perhaps to make a note, but certainly to correctly fill in the top of the ballot.
And there are two ballots that were essentially hand-delivered and voted absentee in person past the deadline. And those are the two that Ms. Kile voted in their home [sic].
Mr. Green did have a proper November 20 request saying he was out of state, but it's an in-person vote after the deadline.
With respect to Ms. Pate, there was only an October 23rd request indicating bad health. So in a sense, she voted also in person after the deadline, and there was not a valid request. And the law says that those requests are supposed to be specific.
With respect to Elvie Robinson, her request was only for October 23rd. It was a hand-delivered, and I consider that an invalid request. And the registrar is not supposed to respond to invalid requests.
The only problem with the Kellogg ballot is that it was delivered by the registrar, and it is certainly the least offensive of those three.
(R. Vol. 5, at 859-60) (emphasis added).
[20] Not only does the record evidence support this conclusion, but Mr. Browne testified without objection to a comment Ms. Kile told him, essentially stating that there were so many irregularities that something had to be done about "these absentees." (R. Vol. 2, at 275). Further, we recall the State's comment at oral argument that this case presents the worst case for failure to follow the absentee laws that the Commissioner of Elections' office had ever seen.
[21] We note that a party contesting an election no longer must show that "but for" the irregularity he would have won the election. This requirement was once mandated by our code, see La. R.S. 18:364, repealed by 1976 La. Acts 697, § 1, and jurisprudence, see, e.g., Moreau v. Tonry, 339 So.2d 3, 4 (La.1976). However, with the adoption of our current Election Code, effective January 1, 1978, La. R.S. 18:1431:1432 removed and deleted the statutory language requiring the challenger to prove "but for." By removing that burden, the Legislature has expressed its solemn will from which the courts of this State may not derogate. Because the Legislature changed the statute, we must recognize that the prior law, as expressed in our pre-election code decision, has changed and has been superceded.
[22] The date of this special general election is ordered pursuant to La. R.S. 18:402(E)(2)(c) which provides that a special general election shall be held on one of the following days:

The fourth Saturday after the first Saturday in April of any year unless the primary election is held on the second Tuesday in March; in such case the general election shall be held on the third Saturday in April; however commencing in 1986 and every fourth year thereafter, this date shall not be applicable in a parish containing a municipality with a population of four hundred seventy-five thousand or more.
[23] Pursuant to La. S.Ct. R. IX, § 6 and X, § 5(c), an application for rehearing will not be considered or entertained by this Court.
[1] Donald Browne (plaintiff's representative) timely (during the counting of the absentee ballots) challenged all ballots that were not properly notarized or witnessed by two persons. The Board of Election Supervisors invalidated forty-three mail-in ballots that were not properly executed, but denied Browne's request to see the other mail-in ballots. Therefore, Browne did not waive his objection to Fowler's ballot, because he was not allowed to inspect that ballot during the counting, as the trial judge at least implicitly found. The court of appeal agreed, concluding that Browne's objections were sufficient to encompass Fowler's mail-in ballot.
[2] In my view, it is irrelevant whether the notice to the registrar is provided by a candidate or by the voter who did not receive the ballot or by a third person. I see no difference between a candidate's notifying the registrar and the voter's doing so at the request of a candidate whom the voter supports.
[3] Hand-delivery of mail-in ballots is fraught with potential for abuse. However, the disadvantage of hand-delivery under the circumstances of this case must be balanced against the problems created by the non-delivery of the ballot to the voter who properly and timely requested a ballot.
[4] The court of appeal pretermitted a decision on Pate's ballot as unnecessary after determining that all of the ballots, except the two on which decision was pretermitted, were valid.
[5] Jocille Kellogg filed a proper written application to vote by mail in the general election, and the application was received timely by the registrar. Upon receiving notice that Kellogg had not received the ballot, the registrar hand-delivered a ballot to Kellogg on November 18. After the registrar left, Kellogg voted the ballot and had her relative deliver the ballot to the registrar.

I agree with the court of appeal that the registrar's action in hand-delivering a properly and timely requested ballot, under the circumstances, did not affect the sanctity of the ballot or the integrity of the election. As that court noted, the registrar was attempting to rectify a mistake attributable to someone other than Kellogg and to permit Kellogg to exercise her constitutional right to vote in accordance with her proper and timely request.
[6] Marvin Green properly delivered an application to vote by mail in the general election, and the registrar received the request timely. When the registrar was notified that Green had not received the requested ballot, she hand-delivered the ballot to Green on November 18. Green voted the ballot in the presence of the registrar. The registrar kept the ballots in her car overnight, and the next day the registrar executed the flap portion of the ballot and marked the ballot as voted on November 19 in the registrar's presence.

While it was unwise for the registrar to remain at Green's home while he voted and to take the ballot back to her office and mark it as voted the next day, the registrar acted in good faith, and her actions should not redound to the detriment of the voter who properly and timely requested a ballot and then voted it properly.